Virginia WINTER et al., Plaintiffs,

v.

Robert B. DOCKING, in his official capacity as Governor of the State of Kansas, et al., Defendants.

No. W-4828.

United States District Court,
D. Kansas.

March 14, 1974.

Theodore H. Hill, Mearle D. Mason, Thomas H. Graber, Wichita, Kan., for plaintiffs.

Vern Miller, Atty. Gen., William H. Ward, John R. Martin, Asst. Attys. Gen., Topeka, Kan., for defendant.

Jack A. Quinlan, Topeka, Kan., for Kans. Legis. Coord. Council.

Before HILL, Circuit Judge, BROWN, Chief Judge, and TEMPLAR, District Judge.

OPINION

PER CURIAM.

The action was originally brought to invalidate the 1972 legislative reapportionment of the Kansas House of Representatives. This court determined such reapportionment to be invalid and unconstitutional. Winter et al v. Docking et al., 356 F.Supp. 88. No appeal was taken from that decision. This court therein withheld the effectiveness of its decree and retained jurisdiction, giving the Kansas Legislature until February 16, 1974, to enact a valid reapportionment. During the 1973 session of such Legislature, that body enacted House Bills 1570 and 1586, thereby effectuating a new reapportionment as we had directed.

After a joint request by the defendants and the intervenor the court was reconvened and a hearing was held to determine the validity of the recent reapportionment efforts.

At the outset, it is significant that subsequent to our prior decision in this case the Supreme Court handed down several opinions in this area of the law.

In our view, by these cases, Gaffney v. Cummings, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973); White v. Regester, 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed. 314 (1973); Mahan v. Howell, 410 U.S. 315, 93 S.Ct. 979, 35 L.Ed.2d 320 (1973), the Supreme Court suggests somewhat of a relaxation from earlier principles regarding state legislative reapportionment, as first announced in Reynolds v. Simms, 377 U.S. 533, 84 S. Ct. 1362, 12 L.Ed.2d 506 (1964).

The Court in *Reynolds*, the polestar state reapportionment case, held both state legislative reapportionment and congressional redistricting must be based on population as nearly as is practicable. Some distinctions between the two were recognized however. A little more flexibility was given state reapportionment plans, with the proviso that any such plan still must be based substantially on population, and as long as any such divergencies were based on "legitimate considerations incident to the effectuation of a rational state policy". There must be justification for such divergencies, in other words.

*Reynolds* and cases following thereafter thus recognize significant distinctions between congressional and state legislative reapportionment. The Court in *Mahan*, however, seems to establish two separate constitutional standards based on such distinctions.

Earlier cases rejected arguments that there is a fixed numerical or percentage population variance small enough to be considered de minimum and to satisfy without question the "as nearly as is practicable" standards. *Justified* deviations were allowed. *Reynolds* indicated such deviations must be based on a rational state policy. Subsequent cases interpreted this phrase to mean state necessity must be shown for the divergence in equal population. Although the Court in *Mahan* does not expressly so state, it seems that case allows unequal representation to a degree so long as some rational basis for the difference can be found. The Court stated:

We are not prepared to say that the decision of the people of Virginia to grant the General Assembly the power to enact local legislation dealing with the political subdivisions is irrational.

A 16% maximum variation thus was found rational, with no more justification than this.

Although the distinctions drawn in *Mahan* seem quite subtle, they do lay the groundwork for *Gaffney* and *White*.

In *Gaffney*, the Court found minor deviations from mathematical equality among state legislative districts (8% maximum deviation here) to be insufficient to make out a prima facie case of discrimination under the Fourteenth Amendment as to require justification by the state. Clearly, a new standard is emerging.

■ These cases indicate minor deviation in equality among districts needs no justification. Where larger deviations are in issue, the "as nearly as is practicable" requirement does not seem to be as important as it once was. Instead, a rational state policy, with a minimum or no justification, may very well now be the key in state legislative reapportionment.

In carving out the various districts, the legislature used the 1972 Kansas State Agricultural Census. This court has previously approved the use of this annual census because from experience it has generally been a more reliable head count in the state than the Federal census. In addition this census is taken each year, thus it is up to date. Under this census the population of Kansas was 2,277,905. There are 125 house districts provided for by law to be apportioned between the 105 counties of the state. The ideal district under this population count would contain 18,223 persons. Under the reapportionment plan before us 28 districts are within 1% plus or minus of the ideal; 29 districts are plus or minus 2%; 28 districts are plus or minus 3%; 24 districts are plus or minus 4%; 11 districts are plus or minus 5%; and 5 districts are in excess

of the 5% above or below the ideal, the largest variance in this latter group being 11.6%.

■ The testimony of Mr. Paul Firling, an expert in the office of the Legislative Research Department and who actually prepared the questioned apportionment plan for the House Reapportionment Committee, amply supports our findings as to a rational state policy. In addition, our examination of the state map showing the geographic make-up of the various legislative districts and numerous other exhibits in the record leads us to conclude the existence of such a rational state policy. Such policy was clearly an attempt by the legislature to honor as much as practicable the political subdivision lines in the state and to bring the newly apportioned districts closer to the goal of compactness and contiguity. This fact becomes apparent when we compare this new reapportionment plan with the prior plan struck down by this court. From our experience in prior state legislative reapportionment cases, we fully appreciate and understand the difficulties encountered in dividing the 105 counties of the state into 125 legislative districts. The large variance in population between the counties of the state makes this task even more difficult.[1]

In our prior opinion we did not attempt to enumerate every defect in the reapportionment plan then being considered but did set out a number of glaring infirmities in the plan. It is important now to note that the new plan cures most, if not all, of those listed infirmities. The 1972 Act created one single district in Crawford County and divided the rest of the county so that part went into three other districts. The new Act gives the county two full districts, with four remaining rural townships going into one separate district. The old Act divided Sumner County so that it comprised one district with the remainder divided between four other districts. The new Act divides the county only once, with each of the two parts joined with parts of adjacent counties to form two districts. Under the 1972 plan Butler County was divided to create two complete districts with the remainder of the county divided between three other districts. The 1973 Act leaves that county with two complete districts and all of the remainder of the county is attached to part of another county to form a complete district. The old Act divided three small rural cities. The 1973 Act leaves these cities intact. The 1972 Act gave Cherokee County one full district and divided the excess territory into two districts. The new Act retains the full district and places all of the excess territory into one adjacent district. The map showing the newly drawn district boundaries also generally reflects an attempt by the legislature to achieve more compactness and contiguity than reflected by a map of the prior invalidated plan.

As previously pointed out, the 1972 Kansas Agricultural census was used as the population guide in this reapportionment effect. The Constitution of the State of Kansas, Article X, Section 2, directs the use of this census[2] and this court has approved such in numerous cases.[3]

■ In connection with the taking of the 1972 Kansas census plaintiffs urge discrimination against military personnel and college students. In the trial of this matter the burden of proving such discrimination was upon the plaintiffs. They did not sustain this burden of

1. The 1972 population of the largest county in the state, Sedgwick County, is 333,771, and the smallest, Greeley County, has a population of 2,122.

2. "It shall be the duty of the first legislature to make an apportionment, based upon the census ordered by the last legislative assembly of the territory; and a new apportionment shall be made in the year 1866, and every five years thereafter, based upon the census of the *preceding* year." (Emphasis added).

3. Winter v. Docking, 356 F.Supp. 88; Long v. Docking, 283 F.Supp. 539.

proof. We do have in the record three documents, which refute any such contention of discrimination. These documents are (1) "Instructions Pertaining to Enumeration of Inhabitants for the Year 1972" which was given by the Kansas State Board of Agriculture to each enumerator participating in the taking of the questioned census; (2) copy of an opinion of the Attorney General of Kansas, dated October 13, 1971, and given to the Kansas State Board of Agriculture concerning the listing of students attending college away from home; and (3) a copy of an opinion of the Attorney General of Kansas, dated August 11, 1972, concerning the residence of persons in Kansas living on Federal enclaves. The specific instructions given to the enumerators are consistent with this opinion. These three items are set out in the Appendix attached hereto as "A", "B" and "C".

In the absence of evidence to the contrary we are entitled to presume that the enumerators conducted the population count as instructed.

We readily agree with plaintiffs that this plan is not a symbol of perfection. It has some shortcomings and infirmities. Undoubtedly, it bears some scars of political maneuvering. Our experience with legislative reapportioning acts convinces us that every such endeavor is conceived and born in a political atmosphere and bears the marks of political expediency and compromise. Those facts are inherent in our political system. However, they do not, in themselves, compel the invalidation of this reapportionment plan. We are attempting to follow the guidelines given us by the Supreme Court, and, with those in mind, we determine House Bills 1570 and 1586, the statutes in question, to be a valid and constitutional reapportionment of the House of Representatives of the State of Kansas.

This per curiam opinion is filed in support of our prior dismissal of this action.

## APPENDIX A

The census is taken pursuant to Chapter 11 of Kansas Statutes Annotated, as amended.

## INSTRUCTIONS PERTAINING TO ENUMERATION OF INHABITANTS FOR THE YEAR 1972

1. Take the enumeration as of January 1, 1972. Include the name, address and age of each inhabitant. List all persons who are residents of the county, in alphabetical order, by township or city (by wards in those cities and townships having wards), including those who have died since January 1, 1972. Do not list children born after January 1, 1972.

2. GENERAL. List all persons who have established a permanent residence in the county, including those who are temporarily absent therefrom. Do not list visitors or transients temporarily living in the home.

3. CHILDREN UNDER 18 YEARS OF AGE. List children under 18 years of age at the residence of the father. If the father is dead, list the child at the residence of the mother. If both parents are dead, or if the child is a ward, list him as an inhabitant of the city or township where his guardian or conservator resides.

4. PERSONS 18 YEARS OF AGE AND OVER. Persons 18 years of age and over may establish a residence separate from their parents if they so intend. The place where such a person registers to vote may be accepted as an expression of intent to establish a residence in such city or township, and as his established residence where he should be enumerated.

5. ALIENS. Do not list aliens. List only citizens of the United States. Foreign students should not be listed.

6. MILITARY PERSONNEL. Military personnel are presumed to have the

residence they had at the time of induction into the service. They may, however, abandon this residence and establish another. Military personnel who have established a residence in Kansas should be listed in the city or township where they reside.

7. FEDERAL PROPERTY. Do not list persons living in areas over which the state of Kansas has surrendered jurisdiction to the United States. This includes areas purchased or condemned by the United States for its purposes and those areas designated in Article I, Chapter 27, K.S.A., such as Fort Riley Military Reservation, National Military Home in Leavenworth County, etc. List bona fide residents of Kansas living in a housing project on a military reservation in the county in which the housing project lies geographically, as determined by the descriptions in Chapter 18 of K.S.A.

8. PERSONS IN INSTITUTIONS. List adult persons living in state hospitals as residents of the township or city where they resided before going to the institution.

9. REST AND NURSING HOMES. List those persons living in rest or nursing homes, who have a spouse, at the residence of the spouse. List other persons in such homes, who have abandoned their prior residence, as inhabitants of the township or city where the home is located.

10. In those counties having 15,000 population or more, the statute requires that the county clerk or county assessor shall ascertain the number of inhabitants residing within each of the precincts and wards located within the county. The totals may be shown on the back of the abstract.

Write the names distinctly. The schedules are filed with the State Historical Society and are a permanent record which may be used to prove age or residence.

## APPENDIX B

## STATE OF KANSAS

## OFFICE OF THE ATTORNEY GENERAL

State Capitol Bldg. (913) 296–2215
Topeka, Kansas 66612
October 13, 1971

VERN MILLER
Attorney General

Mr. Warden L. Noe
Attorney

Kansas State Board of Agriculture
State Office Building
Topeka, Kansas 66612

Dear Mr. Noe:

You request our opinion regarding the appropriate instructions to be furnished by the Kansas State Board of Agriculture, pursuant to K.S.A. 11–107, to be followed in the taking of the 1972 enumeration or census, as required by K.S. A. 11–101, which directs that an enumeration be made of the inhabitants of the respective counties. The term "inhabitant" means "resident". State ex rel. Smith v. Duncan, 134 Kan. 85, 4 P. 2d 443 (1931). You specifically request our opinion regarding the determination of persons under the age of twenty-one years, but eighteen or over, who are now entitled to vote under Article 5, Section 1 of our Constitution. The instructions previously given by the board followed traditional rules in the determination of residence. The residence of minors, those under twenty-one years, was listed as that of their father, if living, and if not, as that of their mother. If neither were living, the residence was that of their guardian or conservator. Regarding students, the board instructed thus:

"List unmarried students, minors and adults, whose parents are residents of Kansas, as inhabitants of the city or township where their parents reside. Adult students who have definitely established a residence apart

from their parents, as indicated by where they vote, etc. shall be listed at the place where they reside. List married students over 18 years of age,

Mr. Warden L. Noe
October 13, 1971
Page 2

where they live while attending school. Do not list foreign students."

In 1954 Attorney General Fatzer stated as follows regarding the determination of residence of students:

"[W]e conclude that students who are present in a given community attending college, may or may not by reason of that fact become residents of the community during the period of their enrollment. The criterion that determines whether residence is or is not acquired, is found in the intent of the person concerned and in the objective evidence of that intent. Any person residing in your city who is a citizen of the United States, more than twenty-one years of age and who has resided in the state of Kansas six months and in the township or ward where he proposes to vote at least thirty days, is in our view eligible for registration. The mere fact that his family resides elsewhere and that he has come to his present community for the purpose of attending school does not preclude his acquiring a residence there, provided he entertains the requisite intent. Furthermore, it is pointed out that intent to adopt a place as one's habitation does not necessarily require that one expect to stay there the remainder of his life or even for an indefinite period. If he, during his presence in that community, adopts it as his place of habitation for all purposes, it is sufficient, notwithstanding the fact that he may expect to move to another community at a later date."

The durational residency requirements have been changed, of course, by the recent amendment to our Constitution. However, otherwise, we fully concur in the quoted language.

At that time, however, the minimum voting age was twenty-one and not eighteen. In Jaggar v. Rader, 134 Kan. 570, 7 P.2d 114 (1932) the court stated that "[i]t is well settled, generally speaking, that a minor has no capacity to select a domicile or place of residence of his own." See also Trammel v. Kansas Compensation Board, 142 Kan. 329, 46 P.2d 867 (1935); Roberts v. Robben, 188 Kan. 217, 362 P.2d 29 (1961).

We previously stated that we would issue no opinion upon the continuing validity of this rule, because numerous questions

Mr. Warden L. Noe
October 13, 1971
Page 3

arising from the lowered voting age were under study by interim committees of the Legislature. However, the issue must be faced squarely in order to furnish the advice you request.

On February 17, 1971, the California Attorney General issued an opinion concluding that "for voting purposes the residence of an unmarried minor [whether student or not] . . . will normally be his parents' home", regardless of where the minor's present or intended future habitation might be.

Noting that Section 1 of the Twenty-Sixth Amendment to the United States Constitution provides that "[t]he right of citizens of the United States who are eighteen years of age or older to vote shall not be denied or abridged by the United States or by any State on account of age", the California Supreme Court concluded that refusal to treat minors as adults for voting purposes violates both the letter and spirit of that amendment. Treating minors as "children tied to residential apron strings", and thereby requiring young people to travel to their parents' homes to register and vote, or do otherwise as absentees, constituted an unlawful and unconstitutional abridgment of those persons so treated. Regarding the question of

314

minority and emancipation, the court stated thus:

> "[T]he minor is necessarily emancipated for all purposes relating to voting when he is given the vote in his own right, without regard to the consent of his parent or guardian.
> . . . [W]e conclude that minors over 18 years of age must be treated as adults for voting purposes, and the location of their domiciles may not be questioned on account of their age." Jolicoeur v. Mihaly, (August 27, 1971); 40 Law Week 2142.

The rule that a minor's residence was that of his father was based on the common law premise that a minor was legally incapable of forming an intent to establish a residence independently. This centuries-old legal fiction is today an anachronism which may not be allowed, in our opinion, to impair the exercise of rights guaranteed by the Twenty-sixth Amendment. Accordingly, we cannot but conclude that a minor is *sui generis* for voting purposes.

Mr. Warden L. Noe
October 13, 1971
Page 4

The foregoing does not completely address your inquiry as to where minors shall be deemed to reside for purposes of enumeration. The law has been that a person may have, at any one time, one residence and one only. This necessarily follows from the legal characterization of residence as a concurrence of physical presence and intent. To state the obvious, one cannot be physically present in two places at the same time. Where a minor establishes a separate residence, he must do so in accordance with the laws heretofore determinative of a residence established by an adult. Where a minor establishes residence apart from that of his parents, he necessarily abandons his former residence. Numerous legal relations may be affected. For example, under K.S.A. 8–142, it is unlawful "[f]or the owner of a motor vehicle to file application for the registration thereof, in any county other than the county in which the owner of the vehicle

resides". Of paramount importance, in our opinion, is the constitutional importance of the census. The legislative representation afforded the citizens of our state is apportioned through the state on the basis of population returns taken in the enumeration. If a minor may establish a legal residence separate and independent from his father for voting purposes, he is also entitled to have that residence considered in determining the constitutionally-mandated quantum of legislative representation to be afforded the district of his newly established residence.

We recognize that the census plays an important role in the laws of our state. For example, the salaries of county officials, the distribution of certain state funds, and legislative apportionment all depend upon the population of the various counties as reflected in the census. However, the elements which must coexist to establish legal residence for voting purposes are historically precisely those which are determinative of residence for purposes of enumeration, and we must so conclude here.

In brief summary, we conclude that the voting residence of qualified electors under the age of 21 must be governed by the same laws which have heretofore determined the residence of qualified electors aged 21 or older.

Mr. Warden L. Noe
October 13, 1971
Page 5

It is our opinion that the instructions prepared by the State Board of Agriculture regarding the enumeration of inhabitants, and their residence, must be amended to conform to the views expressed herein. Should you require further clarification regarding any particular instruction, we will be pleased to furnish such assistance and advice as you require.

Yours very truly,

VERN MILLER
Attorney General

JRM:sbs

APPENDIX C

STATE OF KANSAS

Office of the Attorney General

State Capitol Bldg. (913) 296–2215
Topeka, Kansas 66612
August 11, 1972

VERN MILLER
Attorney General

Mr. Keith Sanborn
Sedgwick County Attorney
County Courthouse
Wichita, Kansas 67203

Dear County Attorney Sanborn:

You inquire whether Kansas statutes pertaining to the rights of persons living on Federal enclaves to establish Kansas residence and to register and vote in Kansas elections remain constitutionally permissible in light of the decision of the United States Supreme Court in Evans v. Cornman, 398 U.S. 419, 90 S.Ct. 1752, 26 L.Ed.2d 370 [1970] and Dunn v. Blumstein, 405 U.S. 330, 92 S. Ct. 995, 31 L.Ed.2d 274 [1972]. Article 34 of Ch. 25, Kansas Statutes Annotated, is entitled "Voting By Persons in Federal Enclaves".

K.S.A.1971 Supp. 25–3401 provides as follows:

"Not later than sixty (60) days after the effective date of this act, the governing bodies of every city and county and every election or registration officer shall ascertain that all territory of the state is within a township or a ward. Every public official having any duty or authority under law to determine or change boundaries of any ward or township shall take appropriate action sooner than sixty (60) days after the effective date of this act to insure the inclusion of territory in a township or ward as provided in this action."

And K.S.A.1971 Supp. 25–3402, provides:

"Persons employed by the Government of the United States or any agency or department thereof and members of the household, except soldiers, airmen, seamen and marines in the regular army, air force, or navy of the United States, who have resided or been stationed within the boundaries of the state of Kansas for six (6) months next preceding any election and have resided or been stationed in the township or ward in which he or she offers to vote at least thirty (30) days next pre-

Mr. Keith Sanborn
August 11, 1972
Page Two

ceding any election shall be deemed a qualified elector if such person is a citizen of the United States and is of the age of twenty-one (21) years and upwards. Every person required by the law of this state to be duly registered as a voter before he is entitled to vote shall be required to register as provided by law before being entitled to vote. Registration and election officers are hereby required to register such persons as are authorized to be registered under the provisions of this act upon proper and lawful application of any such person to be registered."

These two statutes change the result of opinions issued by this office in 1965 and 1967 to Senator Ed Reilly, Jr. They also change the result of Herkin v. Glynn, 151 Kan. 855, 101 P.2d 946 [1940]. Those opinions and the Kansas case held that a person living on a Federal enclave could not establish residency for the purpose of voting but the fact that he was a resident prior to entering the enclave did entitle him to cast a vote as a Kansas resident.

The result of these decisions would be that some residents of a Federal enclave would be denied the right to vote in Kansas while others who had been residents prior to residing on the enclave would have the right to vote in a Kansas election.

In addition, the United States Supreme Court cases cited above have affected Kansas law with respect to registration and voting. In *Cornman*, supra,

**316**

the Supreme Court held that residents of a Federal enclave had a stake equal to that of other state residents and were entitled under the Fourteenth Amendment to protect that stake by exercising the equal right to vote.

And in *Blumstein*, supra, the Supreme Court struck down as being unconstitutional the state's durational residency requirements. This office on June 28, 1972, issued an opinion to Richard C. Loux, a member of the Kansas House of Representatives, wherein we said that the six-month residency requirement of the state and the 30-day residency requirement of the precinct were invalid as being violative of the United States Constitution.

Accordingly, the six-month and 30-day requirements set out in K.S.A.1971 Supp. 25-3402 are invalid and as long as a person on a Federal enclave is in fact a bona fide resident of the state, he may register and vote in accordance with our opinion of June 28, if he has registered before the books are closed 20 days prior to the election.

Mr. Keith Sanborn
August 11, 1972
Page Three

An additional question arises when one looks to Article 5, Section 3 of the Kansas Constitution. That section provides in pertinent part as follows:

"For the purpose of voting, no person shall be deemed to have gained or lost a residence by reason of his presence or absence while employed in the service of the United States, . . . [B]ut nothing herein contained shall be deemed to allow any soldier, seaman or marine in the regular Army or Navy of the United States the right to vote."

The last sentence of this constitutional provision was interpreted in Hunt v. Richards, 4 Kan. 549 [1868]. The court had this to say:

"We conclude that a white male person of twenty-one (21) years or upwards, being a citizen of the United States, or having declared his intention to become such, as required by law, who has resided in Kansas six (6) months next preceding any election, and in the township or ward in which he offers to vote, at least thirty (30) days preceding such election, is a legal voter in Kansas; notwithstanding he may be an officer or soldier in the Army of the United States, provided, always, that he shall not be deemed to have gained a residence for the purpose of voting, by reason of his presence while employed in the service of the United States."

We recognize, of course, that the qualifications of a qualified elector as well as the six-month and 30-day residency requirements have been changed since 1868. However, the fact remains that a member of the Armed Forces of the United States is not prohibited from voting in the State of Kansas by the Constitution.

And in Cory v. Spencer, 67 Kan. 648, 73 P. 920 [1903], the Kansas Supreme Court had occasion to interpret the first sentence of the above quoted constitutional provision. The court said:

"This provision is not that, for the purpose of voting, no one can acquire a residence while kept at any almshouse or other asylum at public expense, but that he shall not be deemed or adjudged or have acquired such residence by reasons of his presence while or during the time he is so kept. *This provision of the*

Mr. Keith Sanborn
August 11, 1972

Page Four

*Constitution does not prevent one so kept from acquiring a voting residence if such is his purpose. He is as free to change his residence as if he were not a recipient of this bounty.*" [Emphasis supplied.]

Thus it appears that a member of the Armed Services of the United States is not prohibited from establishing a voting residence in this state merely because he is here in the line of his military duty.

It is our opinion, therefore, that residents of a military enclave, who are in fact bonafide residents of the state of Kansas, are entitled to register and vote in all state elections. Furthermore, members of the Armed Forces of the United States may also establish residency for the purposes of voting.

It must be remembered that determination of residency is a factual situation and we accordingly do not here set out guidelines to be followed in determining such residence. The final decision on this question is one which should be made by local election officials. If, however, any person deems himself grieved by the decision of the local election authorities, this office reserves the right to investigate such grievance complaint and issue further opinions at future dates.

Sincerely,

VERN MILLER
Attorney General

VM/cc